**FARUQI & FARUQI, LLP**
Barbara A. Rohr SBN 273353
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: (424) 256-2884
Facsimile: (424) 256-2885
Email: brohr@faruqilaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGELA KLEINFELDT, Derivatively on Behalf of Nominal Defendant, NATURAL HEALTH TRENDS CORP., <br><br> Plaintiff, <br><br> vs. <br><br> CHRIS T. SHARNG, GEORGE K. BROADY, KIN Y. CHUNG, RANDALL A. MASON, CHRISTOPHER R. O'BRIEN and TIMOTHY S. DAVIDSON, <br><br> Defendants, <br><br> and <br><br> NATURAL HEALTH TRENDS CORP., <br><br> Nominal Defendant. | CASE NO.: 2:16-cv-01547 <br><br> VERIFIED SHAREHOLDER <br><br> DERIVATIVE COMPLAINT <br><br> JURY TRIAL DEMANDED |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Angela Kleinfeldt ("Plaintiff"), by and through her undersigned attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against defendants named herein. Plaintiff alleges the following

based upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, counsel's investigation, which includes, without limitation: (a) a review and analysis of regulatory filings filed by Natural Health Trends Corp. ("Natural Health" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued and disseminated by Natural Health; and (c) a review of other publicly available information concerning Natural Health.

## SUMMARY OF THE ACTION

1.     This is a shareholder's derivative action brought for the benefit of Nominal Defendant Natural Health Trends Corp. ("Natural Health" or the "Company"). Natural Health is an international direct-selling and e-commerce company headquartered in Rolling Hills Estates, California and incorporated in Delaware. The Company's subsidiaries sell personal care, wellness, and "quality of life" products under the "NHT Global" brand. A substantial majority of the Company's revenues come from sales in Hong Kong and the People's Republic of China ("China"). This derivative action is brought against certain members of the Company's Board of Directors (the "Board") and certain of its executive officers (collectively,  the "Individual Defendants") seeking to remedy the Defendants' violations of state law and breaches of fiduciary duty during the period beginning March 6, 2015 through the present (the "Relevant Period").

2.     Defendants' violations arise from a course of misconduct whereby certain Defendants permitted dissemination of false and misleading statements to the investing public concerning the Company's reported financial performance and condition. The course of action related to misrepresenting and/or concealing the following: (i) that the operations of Natural Health's Chinese

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

subsidiary is not in compliance with applicable Chinese laws; (ii) that the Company's Chinese subsidiary is under investigation by Chinese authorities; and (iii) as a result, the statements about Natural Health's business, operations, and prospects made by certain of the Individual Defendants were false and misleading and/or lacked a reasonable basis at all relevant times.

3.     Defendants' misconduct was first revealed on January 7, 2016, when *Seeking Alpha* published a post indicating that an investigative report published in China disclosed that the Company was being investigated by Chinese authorities. On this news, Natural Health's stock dropped $3.11 per share, or over 10% from its prior closing price, to close at $25.92 per share on January 7, 2016.

4.     Then, between January 11, 2016 and January 13, 2016, a number of additional reports were issued by GeoInvesting, Inc. ("GeoInvesting") claiming among other things that: (i) uniformed government officials raided the Company's Beijing office on or around December 24, 2015 and seized property, including several computers; (ii) on December 28, 2015, Natural Health suspiciously posted a special notice on its website warning distributors to cease from using the Company's name or logo without written authorization from Natural Health; (iii) photos from Natural Health's Hong Kong website appeared to confirm that the Company is operating an illegal multi-level marketing scheme in China without a direct selling license; (iv) on January 8, 2016, Natural Health issued an announcement that its distributor website would be temporarily suspended for maintenance; and (v) several reputable Chinese media sites, including *SINA Finance,* claimed that the Company had been raided and was under investigation.

5.     As a result of these revelations, the Company's stock got battered despite the Company's denials.  From its closing price of $29.03 on January 6, 2016 (the day before the truth began to be made public) through January 15, 2016,

when the dust had settled and the Company's stock closed at $17.75 per share, Natural Health shares had fallen $11.28 per share or almost 39%.

6.    Not surprisingly, the Company is now subject to two class action securities lawsuits alleging violations of the federal securities laws on behalf of purchasers of Natural Health stock from March 6, 2015 to January 12, 2016, inclusive (the "Class Period").  These cases are currently pending in the United States District Court, Central District of California (hereinafter the "Securities Class Actions").[1]

7.    Further, the Individual Defendants caused the Company to engage in a series of stock buybacks while Natural Health stock was trading at artificially inflated prices due to the misrepresentations that form the basis of the Securities Class Actions.  The amount per share in excess of the true value of Natural Health stock that the Individual Defendants caused the Company to buy back amounts to waste.  To exacerbate the problem further, pursuant to contractual arrangements with Natural Health approved by the Board, Defendant George K. Broady, the Company's controlling shareholder with over a 30% stake, was permitted to sell approximately $4.5 million worth of his personal holdings as part of the Company's stock buyback program at artificially inflated prices, thereby damaging the Company.  Defendant Broady received an additional $14.4 million in proceeds from open market sales of his Company stock at artificially inflated prices, netting in the aggregate approximately $19 million in proceeds from both private off-market and open market sales.  Two of the other Individual Defendants, Chris T. Sharng, the Company's President and also a Director, and Randall A. Mason,

---

[1] Those cases are docketed at: (1) *Ford, et al. v. Natural Health Trends Corp., et al.,* Case No: 2:16-cv-00255; and (2) *Li, et al. v. Natural Health Trends Corp., et al.,* Case No: 2:16-cv-00309.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Natural Health's Chairman of the Board, also sold Company stock in the open market at artificially inflated prices.

8. The Individual Defendants have vehemently denied that anything is amiss at the Company and substantially increased its buyback program that together has had the effect of propping up the price of Natural Health stock.

<u>**JURISDICTION AND VENUE**</u>

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. There is complete diversity among the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10. This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contact with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

11. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding in violation of fiduciary duties owed to Natural Health occurred in this District and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that have an effect in this District.

<u>**PARTIES**</u>

12. Plaintiff is currently and has continuously been a stockholder of Natural Health since before the beginning of the Relevant Period. Plaintiff is a citizen of New York.

13.     Nominal Defendant Natural Health is incorporated under the laws of the State of Delaware and maintains its headquarters in Rolling Hills Estates, California.     According to the Company's SEC filings, Natural Health is an international direct-selling and e-commerce company.     The Company's subsidiaries sell personal care, wellness, and "quality of life" products under the "NHT Global" brand.     Natural Health's shares are listed and traded on the NASDAQ Exchange under the ticker "NHTC."     As of October 20, 2015, the Company had 12,239,498 shares of the Company's common stock outstanding.

***Chris T. Sharng***

14.     Defendant Chris T. Sharng ("Sharng") has served as the President of Natural Health since February 2007, and as a director since March 2012.     He previously served as Executive Vice President and Chief Financial Officer ("CFO") of the Company from August 2004 to February 2007.     According to the Company's proxy statement filed on Schedule 14A with the SEC on March 20, 2015 (the "2015 Proxy"), "as the Company's President since 2007, and as the Chief Financial Officer prior to that, Mr. Sharng has developed a deep understanding of our business globally."     Sharng is a defendant in the Securities Class Actions.     Upon information and belief, Sharng is a citizen of California.

15.     According to the 2015 Proxy, for the fiscal year ended December 31, 2014, Defendant Sharng received $2,527,531 in total compensation from the Company, which included a salary in the amount of $500,000, a cash bonus in the amount of $1,655,419, stock awards worth $341,777 and $30,335 in other compensation.

16.     During the Relevant Period, Defendant Sharng, based on his knowledge of material non-public information regarding the Company, made the following sales of Company stock while the stock price was artificially inflated:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Date of Transaction | Shares Sold | Price Per Share | Proceeds |
|---|---|---|---|
| November 16, 2015 | 11,000 | $53.86 | $592,460 |
| November 17, 2015 | 2,125 | $53.90 | $114,537 |
| | | | |
| TOTALS | 13,125 | | $706,997 |

### *George K. Broady*

17.    Defendant George K. Broady ("Broady") has served as a director of the Company since October 2008.  According to the 2015 Proxy, Broady is the beneficial owner of approximately 30.4% of the Company's common stock and "is an experienced investor and businessman who also brings welcome insight into management, operations and finances.  As a long-time investor in the Company, and incumbent director, Broady has a deep understanding of the business of the Company and its industry."  Upon information and belief, Broady is a citizen of Texas.

18.    According to the 2015 Proxy, Defendant Broady received a total of $238,238 in total director compensation from the Company in 2014, which included $225,000 in cash and $13,238 in other compensation.

19.    During the Relevant Period, Broady sold 474,177 shares of his personal holdings of Natural Health stock at artificially inflated prices for proceeds of $18,823,005.62 in both private off-market transactions as part of the Company's stock buyback program pursuant to a contractual agreement between the Company and Broady, and in open market transactions.

20.    Broady, based on his knowledge of material non-public information regarding the Company, made the following open market sales of Company stock while the stock price was artificially inflated:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Date of Transaction | Shares Sold | Price Per Share | Proceeds |
|---|---|---|---|
| May 18, 2015 | 50,000 | $33.13 | $1,656,500 |
| May 19, 2015 | 20,174 | $34.81 | $702,256 |
| May 20, 2015 | 4,745 | $33 | $156,585 |
| May 21, 2015 | 75,081 | $30.16 | $2,264,442 |
| November 3, 2015 | 28,000 | $51.88 | $1,452,640 |
| November 4, 2015 | 4,841 | $53.07 | $256,911 |
| November 5, 2015 | 61,210 | $51.16 | $3,131,503 |
| November 6, 2015 | 36,713 | $51.47 | $1,889,618 |
| November 12, 2015 | 3,000 | $52.12 | $156,360 |
| November 13, 2015 | 3,625 | $52.82 | $191,472 |
| November 16, 2015 | 3,000 | $53.00 | $159,000 |
| November 30, 2015 | 9,574 | $48.83 | $467,498 |
| December 2, 2015 | 3,060 | $47.42 | $145,105 |
| December 3, 2015 | 3,200 | $47.52 | $152,064 |
| December 4, 2015 | 12,315 | $47.09 | $579,913 |
| December 8, 2015 | 5,421 | $47.35 | $256,684 |
| December 9, 2015 | 4,100 | $49.47 | $202,827 |
| December 10, 2015 | 12,330 | $49.49 | $610,211 |
| | | | |
| TOTALS | 340,389 | | $14,431,589 |

21.     Broady, based on his knowledge of material non-public information regarding the Company, also engaged in private off-market sales of Company stock in connection with Natural Health's stock buyback program pursuant to a contractual agreement with the Company approved by the Board while the stock price was artificially inflated.   The Company entered into the following Stock Repurchase Agreements ("SRAs") with Defendant Broady that provided for the Company's purchase of common stock from Broady in off-the-market, private transactions:

a.      On May 7, 2015, the Company entered into an SRA with Broady that provided for the Company's purchase of common

stock from Broady in off-the-market, private transactions at a rate equal to 0.4286 times the number of shares purchased by the Company's broker in conjunction with the stock repurchase program authorized by the Company's Board of Directors on May 4, 2015. The Company's purchases from Broady included: 43,932 shares on May 11, 2013 at $26.48 per share and 12,027 shares on May 13, 2015 at $27.95 per share for total proceeds of approximately $1.5 million.

b.   On July 31, 2015, the Company entered into an SRA with Broady that provided for the Company's purchase of common stock from Broady in off-the-market, private transactions at a rate equal to 0.4085 times the number of shares purchased by the Company's broker in conjunction with the stock repurchase program authorized by the Company's Board of Directors on July 28, 2015. The Company's purchases from Broady included: 47,112 shares on August 6, 2015 at $30.76 per share for total proceeds of approximately $1.45 million.

c.   On October 28, 2015, the Company entered into an SRA with Broady that provided for the Company's purchase of common stock from Broady in off-the-market, private transactions at a rate equal to 0.4066 times the number of shares purchased by the Company's broker in conjunction with the stock repurchase program authorized by the Company's Board of Directors on July 28, 2015. The Company's purchases from Broady included 30,717 shares on October 30, 2015 at $46.97 per share for total proceeds of approximately $1.44 million.

9

22.     Additionally, Broady is the owner of Broady Health Sciences, L.L.C. ("BHS").  During 2011 and 2012, BHS permitted the Company to manufacture (or have manufactured), market and sell a new product called *Restor*™.  In April 2012, the Company reimbursed BHS $42,000 in expenses incurred in 2011 to promote the *Restor*™ product on the Company's behalf. To permit the Company to continue selling *Restor*™ and obtain certain exclusive rights outside of the United States, BHS requested that the Company enter into a Royalty Agreement and License.  In February 2013, the Company entered into the Royalty Agreement and License with BHS whereby the Company agreed to pay BHS a royalty of 2.5% of sales revenue for *Restor*™ in 2011 and subsequent years in return for the right to manufacture (or have manufactured), market, import, export and sell this product worldwide, with certain rights being exclusive outside the United States.

23.     On April 29, 2015, the Company and BHS amended the Royalty Agreement and License to change the royalty to a price per unit instead of 2.5% of sales revenue.  Such provision was effective retroactively to January 1, 2015. Such royalties were $154,000 and $40,000 for the three months ended September 30, 2015 and 2014, respectively, and $410,000 and $105,000 for the nine months ended September 30, 2015 and 2014, respectively.  The Company is not required to purchase any product under the agreement, and the agreement may be terminated at any time on 120 days' notice or, under certain circumstances, with no notice.  Otherwise, the agreement terminates March 31, 2020.

24.     Additionally, on April 29, 2015, the Company entered into a Royalty Agreement and License with BHS regarding the manufacture and sale of a product called *Soothe*™.  The Company began selling *Soothe*™ in the fourth quarter of 2012 with the permission of BHS.  Under the agreement, the Company agreed to pay BHS a royalty of 2.5% of sales revenue in return for the right to manufacture

1  (or have manufactured), market, import, export and sell *Soothe*™ worldwide.
2  Further, the Company agreed to pay BHS $11,700 as royalties for the period it
3  began selling *Soothe*™ in the fourth quarter of 2012 through 2014.  Royalties
4  recognized during the three months ended September 30, 2015 and 2014 were
5  $1,300 and $1,400, respectively, and $5,200 and $4,600 for the nine months ended
6  September 30, 2015 and 2014, respectively.  The Company is not required to
7  purchase any product under the agreement, and the agreement may be terminated
8  at any time on 120 days' notice.  Otherwise, the agreement terminates March 31,
9  2020.

10  ***Kin Y. Chung***

11     25.     Defendant Kin Y. Chung ("Chung") has served as a director of the
12  Company since February 2015.  Chung is also a member of the Board's Audit
13  Committee and a purported Independent Director.  According to the 2015 Proxy,
14  Chung founded Bioherb Technology Company, Ltd. in 1988 and served as
15  President of that company from the date of its founding through 2013, at which
16  time he retired.  Chung was also a consultant with Blue Ocean Corporation
17  Limited, which provided business consulting services to the Company from June
18  2009 through June 2010.  According to the 2015 Proxy, Chung has directly
19  provided business consulting services to the Company since July 2010, but ceased
20  doing so prior to his election to the Board.  The 2015 Proxy also states that "Chung
21  has been a life-long entrepreneur and businessperson, active in Greater China, by
22  far the Company's most important market.  He is extensively experienced in
23  business practices, culture and protocol, particularly those of Hong Kong and
24  China.  Chung is also an expert in importing and exporting consumer products for
25  the Company's core markets."  Upon information and belief, Chung is a citizen of
26  China.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*Randall A. Mason*

26.     Defendant Randall A. Mason ("Mason") has served as a director of the Company since May 2003 and as Chairman of the Board since March 2006. Mason is the Chairman of the Audit Committee and the Nominating and Corporate Governance Committee ("Nominating Committee"). He is also a member of the Compensation Committee. Mason is described by the Company as the "audit committee financial expert." According to the 2015 Proxy, Mason is an experienced businessman with valued insight into management, operations, finances and governance issues. Further, the 2015 Proxy states that "as a long-time member of the Board, Mr. Mason understands the business of the Company and potential risks and pitfalls." Upon information and belief, Mason is a citizen of Ohio.

27.     According to the 2015 Proxy, Defendant Mason received $286,238 in director compensation from the Company in 2014, including $273,000 in cash and $13,238 in other compensation.

28.     During the Relevant Period, Defendant Mason, based on his knowledge of material non-public information regarding the Company, made the following sales of Company stock while the stock price was artificially inflated:

| Date of Transaction | Shares Sold | Price Per Share | Proceeds |
|---|---|---|---|
| August 5, 2015 | 5,184 | $31.90 | $165,369 |
| November 4, 2015 | 5,000 | $50.69 | $253,450 |
|  |  |  |  |
| TOTALS | 10,184 |  | $418,819 |

*Christopher R. O'Brien*

29.     Defendant Christopher R. O'Brien ("O'Brien") has served as a director of the Company since February 2015. O'Brien is the Chairman of the

Compensation Committee and is a member of the Audit Committee and the Nominating Committee. O'Brien is a shareholder with Polsinelli, LLP, a national law firm where he specializes in corporate law. According to the 2015 Proxy, O'Brien is a seasoned executive and professional in international markets, business development and technology. He is also experienced in the areas of corporate governance, executive compensation and strategic planning. Upon information and belief, O'Brien is a citizen of California.

**Timothy S. Davidson**

30. Defendant Timothy S. Davidson ("Davidson") has served as the CFO and Senior Vice President of the Company since February 2007, and as the Company's Corporate Secretary since January 2014. Davidson has also been designated by the Board to perform the duties of the Company's chief compliance officer and oversee compliance with the Company's Worldwide Code of Business Conduct (the "Code") and its policies and procedures. He previously served as the Company's Chief Accounting Officer from September 2004 to February 2007. Davidson is a defendant in the Securities Class Actions. Upon information and belief, Davidson is a citizen of Texas.

31. According to the 2015 Proxy, for the fiscal year ended December 31, 2014, Defendant Davidson received $926,605 in total compensation from the Company, which included a salary in the amount of $270,000, a cash bonus in the amount of $526,843, stock awards totaling $103,815 and other compensation in the amount of $25,947.

32. Defendants Broady, Chung, Mason, O'Brien and Sharng are sometimes collectively referred to herein as the "Current Director Defendants."

33. Defendants Chung, Mason and O'Brien are sometimes collectively referred to herein as the "Audit Committee Defendants."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

34.     Defendants Mason and O'Brien are sometimes collectively referred to herein as the "Nominating Committee Defendants."

35.     Defendants Broady, Chung, Mason, O'Brien, Sharng and Davidson are sometimes collectively referred to herein as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

36.     By reason of their positions as officers, directors and/or fiduciaries of Natural Health during the Relevant Period and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Natural Health and its shareholders fiduciary obligations of good faith, loyalty and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Natural Health and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

37.     Each director and officer of the Company owes to Natural Health and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company's affairs and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

38.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Natural Health, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Due to their positions with Natural Health, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

39.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Natural Health were required to, among other things:

a.     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal, state and foreign laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c.     Exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

d.     Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

e.     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

40.    Moreover, Natural Health maintains a Worldwide Code of Business Conduct (hereinafter the "Code"), which applies to the Company's directors, chief executive officer, chief financial officer, principal accounting officer or controller, and all other officers and employees of the Company.  The purpose of the Code is guidance.  The Code states in relevant part:

**Compliance**

***Compliance with this Worldwide Code of Business Conduct ("Code") is required of everyone who acts on behalf of Natural Health Trends Corp. or one of its subsidiaries*** (together, the "Company" or "Natural Health Trends Corp.").  ***That includes the Company's directors, chief executive officer, chief financial officer, principal accounting officer or controller, and all other officers and employees of the Company.***  Anyone who violates our Code will be acting outside the scope of his or her employment (or agency) and will be subject to disciplinary action, up to and including termination of employment.  Our Chief Financial Officer has been designated by the Board of Directors (the "Board") to perform the duties of the Company's chief compliance officer (the "chief compliance officer") and oversee compliance with our Code and its policies and procedures.

If at any time you have an ethical concern or become aware of any conduct that violates – or may violate – ***our high ethical standards*** or any company policy, you should report such concern or conduct to your supervisor or to the chief compliance officer.  See the section entitled "How To Report Violations" in Section VIII of this Code for more detail.

Each director, officer and employee will be asked to complete and submit an "Acknowledgment of Receipt" that you have received and read a copy of the Code and agree to comply with its requirements.

(Emphasis added).        ***

A. **Compliance With Laws Generally**

The Company, and its directors, officers and employees, ***will abide by the letter and the spirit of all applicable laws and regulations***, and will act in such a manner that the full disclosure of all facts related to any activity will always reflect favorably upon the Company.

The international business operations of Natural Health Trends Corp. may encounter local laws, customs and social standards that differ widely from U.S. practice.  ***It is Company policy to abide by the***

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*national and local laws of the countries and markets in which we operate,* unless prohibited by U.S. law. When local customs and businesses or social practices vary from the standards contained in this Code, it is permissible to conform to local customs and practices when necessary for the proper conduct of the Company's business provided that it does not violate U.S. law, such as the Foreign Corrupt Practices Act (discussed below) and when approved by the chief compliance officer.

(Emphasis added).

***

## Accuracy of Company Records

Natural Health Trends Corp. business transactions worldwide must be properly authorized and be completely and accurately recorded in the Company's books and records in accordance with generally accepted accounting practice and established Company financial policies and procedures. Budget proposals and economic evaluations must fairly represent all information relevant to the decision being requested or recommended. *No false, artificial, or misleading entries in the books and records of the Company, domestic or foreign, shall be made for any reason and no employee shall engage in any arrangement that results in such prohibited acts.* The retention or proper disposal of Company records shall be in accordance with established Natural Health Trends Corp. financial policies and applicable statutory and legal requirements.

(Emphasis added).

***

## Public Reporting

As a public company, the Company files reports and other documents with the Securities and Exchange Commission (the "SEC") and the stock exchange on which our securities trade. The Company also issues press releases and makes other public statements that include financial and other information about our business, financial condition and results of operations. *The Company endeavors to make full, fair, accurate, timely and understandable disclosure in reports and documents that are filed with, or submitted to, the SEC and in press releases and public communications.*

The Company requires cooperation and open communication with its internal accounting staff and outside auditors. It is illegal to take any action to fraudulently influence, coerce, manipulate or mislead any internal accounting staff or external auditor engaged in the performance of an audit of the Company's financial statements.

The laws and regulations applicable to filings made with the SEC, including those applicable to accounting matters, are complex. While the ultimate responsibility for the information included in these

17

reports rests with senior management, numerous other employees participate in the preparation of these reports or provide information included in these reports. ***The Company maintains disclosure controls and procedures to ensure that the information included in the reports that are filed with, or submit to, the SEC is collected and communicated to senior management in order to permit timely disclosure of the required information.***

If you are requested to provide, review or certify information in connection with applicable disclosure controls and procedures, you must provide the requested information or otherwise respond in a full, accurate and timely manner. Moreover, even in the absence of a specific request, you should report any significant information that you believe should be considered for disclosure in our reports to the SEC to your supervisor or a more senior manager.

(Emphasis added).

\*\*\*

## Securities Trading and Non-Public Information

In the normal course of business, you may have access to information that would affect the value of the stock or other securities of the Company or another company. Until this information is publicly disclosed, it is considered material non-public information and must be kept confidential. ***Acting on this information for personal gain or disclosing it to anyone else before it has been released to the public violates federal law and Company policy.***

Information is material if it would influence a reasonable person's decision to buy, sell or hold a company's stock or other securities. It includes, among other things, information about revenue, earnings, major contracts, possible dividend changes, as well as stock splits, new stock or bond offerings, significant acquisitions or divestitures, ***and major changes in management, corporate structure or policy. You may not trade while possessing this information,*** or disclose it to anyone else, including relatives, friends, co-workers or stockbrokers, until the information has been released publicly and the public has had time to react to the information.

Trading while in possession of material non-public information creates an unfair advantage over investors who do not have access to this information. Federal securities laws are designed to protect the investing public by prohibiting anyone with access to material non-public information from exploiting this advantage. Penalties for violations are severe and include criminal fines and imprisonment, payment to damaged investors of any profits made from trading on the information, and payment of civil penalties of up to three times the amount of profits made or losses avoided. In addition, the Company may be penalized for violations by its directors, officers and employees.

18

*Although the nature of their duties means that some directors, officers and employees have greater access to non-public information than others do, the rules apply to anyone who has direct or indirect access to material non-public information.* This includes everyone from officers and directors to secretaries who may type confidential memoranda or technical personnel who may work on new projects.

The following guidelines are intended to help you comply with the rules regarding non-public information:

    i.    Material non-public information should be shared only with Company employees whose jobs require them to have the information.

    ii.    Do not disclose sensitive or non-public information to anyone who is not an employee of the Company. The Company has standard procedures for the release of information to the public.

    iii.    *You should not buy or sell stock or other securities of Natural Health Trends Corp.* or another company, or direct someone else to buy or sell these for you, *when you possess material information about Natural Health Trends Corp. or such other company that has not been made public.* After it has been made public, you cannot act on the information until the public has had time to react to the information.

    iv.    You should immediately notify the chief compliance officer, if you believe that you or anyone else has disclosed, even inadvertently, sensitive or non-public information relating to the Company to anyone who is not an employee of the Company.

(Emphasis added).

***

**Conflicts of Interest**

*Each employee, officer and director of the Company must conduct the business affairs of the Company in the best interests of the Company and should therefore avoid situations where their private interests interfere in any way with the Company's interests.* We need to be especially sensitive to situations that have even the appearance of impropriety and promptly report them to a supervisor, or if appropriate, a more senior manager. If you believe that a transaction, relationship or other circumstance creates or may create a conflict of interest, you should promptly report this concern. Conflicts of interest are prohibited as a matter of Company policy, except under guidelines approved by the Board or a committee of the Board. As further described below, any waiver of this conflict of interest policy for a director of executive officer must be approved in writing by our Board, and any such waiver should be disclosed to the

19

extent required on the Company's website or in a report filed with the SEC within four days of the waiver.

(Emphasis added).

41.    According to the Nominating and Corporate Governance Committee Charter (the "Nominating Committee Charter"), the Nominating Committee is responsible for periodically reviewing and overseeing compliance with the Company's corporate governance policies, including the Code, and reviewing conflicts of interest.  The Nominating Committee Charter states the following, in relevant part:

The Committee has the following duties and responsibilities:

Codes of Conduct and Corporate Governance Policies.   The Committee shall oversee compliance with, and periodically review, the Corporation's codes of conduct and corporate governance policies, including the Corporation's Worldwide Code of Business Conduct, and shall recommend to the Board modifications to the policies as appropriate.

\*\*\*

Review Possible Conflicts of Interest.  The Committee shall consider possible conflicts of interest of Board members and management and make recommendations to prevent, minimize, or eliminate such conflicts of interest.

42.    With respect to the Audit Committee, according to the Audit Committee Charter, the Audit Committee has the following duties and responsibilities, in relevant part:

**Duties and Responsibilities**

The Committee is responsible for ***overseeing the accounting and financial reporting processes of the Corporation*** and the audits of the financial statements of the Corporation on behalf of the Board. Management is responsible for the preparation, presentation and integrity of the Corporation's financial statements and for the appropriateness of the accounting and reporting policies that are used by the Corporation.

(Emphasis added).

*** 

*Finance Reporting and Internal Control.*

<u>Review and Discuss Financial Statements and Disclosures.</u>   The Committee is to review and discuss with appropriate officers of the Corporation and the independent auditors the annual audited and quarterly financial statements of the Corporation, including (a) ***the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations,"*** and (b) ***the disclosures regarding internal controls and other matters required by Sections 302 and 404 of the Sarbanes-Oxley Act of 2002 and any rules promulgated thereunder by the SEC.***

<u>Review and Discuss the Systems of Internal Accounting Controls.</u> The Committee is to review and discuss with the independent auditors, and if and to the extent deemed appropriate by the Committee Chair, members of its staff, ***the adequacy of the Corporation's internal accounting controls,*** the Corporation's financial, auditing and accounting organizations and personnel, and ***the Corporation's policies and compliance procedures with respect to business practices, which shall include (a) the disclosures regarding internal controls and matters required by Sections 302 and 404 of the Sarbanes-Oxley Act of 2002 and any rules promulgated thereunder by the SEC, and (b) as applicable, a review with the independent auditors of their opinion on the effectiveness of management's assessment of internal controls over financial reporting.***

(Emphasis added).

***

*Legal, Regulatory and Ethical Matters.*

<u>Discuss Risk Management Policies.</u>   The Committee is to discuss guidelines and policies with respect to ***risk assessment and risk management to assess and manage the Corporation's exposure to risk.***   The Committee should discuss with appropriate officers of the Corporation ***the major financial risk exposures of the Corporation and the steps management has taken to monitor and control these exposures.***

<u>Discuss Matters Regarding Financial Statements or Compliance Policies.</u>  The Committee should discuss with the Corporation's legal counsel ***legal matters that may have a material impact on the financial statements*** or the Corporation's compliance policies.

<u>Review and Approval of Related Party Transactions.</u>  The Committee shall ***review and provide oversight of insider, affiliated and related party transactions*** and disclosures for potential conflict of interest

situations, and all such transactions shall be subject to the Committee's approval.

(Emphasis added).

43.    According to Natural Health's 2015 Proxy, the Board was responsible for risk oversight:

> ***Our Board of Directors has responsibility for the oversight of risks that could affect the Company.*** This oversight is conducted primarily through the Board of Directors with respect to significant matters, including the strategic direction of the Company, and by the various committees of the Board of Directors in accordance with their charters. ***The Board of Directors continually works, with the input of its committees and of the Company's management to assess and analyze the most likely areas of future risk for the Company.*** Directors also have complete and open access to all of our employees and are free to, and do, communicate directly with our management. ***In addition to our formal compliance efforts, the Board of Directors encourages management to promote a corporate culture that incorporates risk management into the Company's corporate strategy and day-to-day business operations.***
>
> The Company has a Worldwide Code of Business Conduct (the "Code") that applies to our employees, officers (including our principal executive officer and principal financial officer) and directors. ***The Code is intended to establish standards necessary to deter wrongdoing and to promote compliance with applicable governmental laws, rules and regulations, and honest and ethical conduct.*** The Code covers many areas of professional conduct, including conflicts of interest, financial reporting and disclosure, protection of Company assets and confidentiality. Employees have an obligation to promptly report any known or suspected violation of the Code without fear of retaliation. Waiver of any provision of the Code for executive officers and directors may only be granted by the Board of Directors or one of its committees and any such waiver or modification of the Code relating to such individuals will be disclosed by the Company.

(Emphasis added).

44.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duty of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.    The conduct of the Individual

22

Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Natural Health, the absence of good faith on their part and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

45. The Individual Defendants breached their duties of loyalty and good faith by: (i) permitting the Company to issue materially false and misleading statements concerning Natural Health's business and financial performance and condition resulting in the commencement of the Securities Class Actions; (ii) failing to maintain a system of effective internal controls over financial reporting; (iii) recommending and approving a harmful share repurchase plan for the purpose of keeping Natural Health's stock price artificially inflated and to continue their fraudulent scheme; (iv) causing the Company to purchase stock at artificially inflated prices in connection with Natural Health's share buyback program; (v) engaging in insider selling transactions while in possession of material non-public information; (vi) failing to report violations of laws, rules, regulations or the Code to appropriate personnel; (vii) failing to exercise oversight over related party transactions and the Company's operations in China; and (viii) failing to assess, analyze and implement policies and guidelines relating to risk management and/or failing to monitor and/or control the Company's exposure to risk.

## SUBSTANTIVE ALLEGATIONS

**Background**

46. Natural Health is an international direct-selling and e-commerce company. Subsidiaries controlled by the Company sell personal care, wellness, and "quality of life" products under the "NHT Global" brand. In most markets, the Company sells its products to a network of consumers or business builders that

either uses the products themselves or resells them to consumers. The Company was originally incorporated as a Florida corporation in 1988. It merged into one of its subsidiaries and re-incorporated in Delaware effective June 29, 2005. The Company's common stock is currently traded on the NASDAQ Capital Market under the symbol "NHTC." In September 2015, the Company relocated its corporate headquarters from Dallas, TX to Rolling Hills Estates, CA.

47. The Company's wholly-owned subsidiaries have an active physical presence in the following markets: North America; Greater China, which consists of Hong Kong, Taiwan and China; South Korea; Japan; and Europe, which consists of Italy and Slovenia. The Company also operates within certain Commonwealth of Independent States (Russia, Kazakhstan and Ukraine) through its engagement with a local service provider.

48. According to the 2014 10-K, the Company seeks to sell its products into many markets, primarily through its network marketing operations. The exception is China, where the Company sells directly to consumers through an e-commerce platform. The Company's objectives are to enrich the lives of users of its products and enable Natural Health's distributors to benefit financially from the sale of its products.

**Natural Health's Business Model**

49. According to the 2014 10-K, Natural Health distributes its products internationally primarily through a network marketing system, which is a form of person-to-person direct selling. Under this system, the Company's distributors primarily refer Natural Health's products to prospective consumers or they may buy at wholesale prices for resale to consumers and for personal consumption. Natural Health's distributors are independent, full-time or part-time contractors who purchase products directly from the Company's subsidiaries via the internet

for resale to retail customers (other than in China and certain other markets) or for their own personal consumption. Purchasers of the Company's products in China and certain other markets may purchase only for their personal consumption and not for resale.

50. Direct-selling, or multi-level-marketing ("MLM"), activities are regulated by various federal, state and local governmental agencies in the United States and other countries. These laws and regulations are generally intended to prevent fraudulent or deceptive schemes, often referred to as "pyramid" schemes, which compensate participants for recruiting additional participants irrespective of product sales, use high-pressure recruiting methods and/or do not involve legitimate products.

51. As a result of restrictions in China on direct selling activities, the Company claims it does not conduct direct selling in China. Consumers and members purchase Natural Health's products via the Company's Hong Kong-based website or the Company's e-commerce platform in China. Because the Company operates a direct selling model outside of China, its operations have received regulatory and media attention. At the end of 2005, China adopted new direct selling and anti-pyramiding regulations that are restrictive and contain various limitations, including a restriction on the ability to pay multi-level compensation to independent distributors.

52. To augment its business in China, the Company's Chinese subsidiary applied for a direct selling license first in 2005, provided a revised version in June 2006, and then updated it again in November 2007. After approval from municipal and the provincial authorities, the application did not progress any further with the central government. Eventually, the information contained in the Company's 2007 application became stale, and the Company withdrew the license application in

February 2009 in order to furnish new information and intends to amend its application with the goal to re-apply in the future. The Company admits that it is unable to predict whether it will be successful in obtaining a direct selling license to operate in China.

## Certain Defendants Cause Natural Health to Issue False and Misleading Statements

53.     Certain Defendants breached their fiduciary duties by causing and allowing Natural Health to issue public statements which did not accurately portray Natural Health's true financial performance and condition.

54.     On March 6, 2015, the Company filed an annual report for the fiscal year ended December 31, 2014 on Form 10-K with the SEC (the "2014 10-K") signed by the Individual Defendants. The 2014 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Sharng and Davidson stating that: (i) the financial information contained in the 2014 10-K was accurate; (ii) all fraud, whether or not material, was disclosed to the registrant's auditors and the Audit Committee; and (iii) any material changes to the Company's internal control over financial reporting was disclosed.

55.     With respect to the Company's compliance with relevant laws and regulations governing direct selling in the countries in which the Company operates, the 2014 10-K stated the following, in relevant part:

> Based on advice of our engaged outside professionals in existing markets, the nature and scope of inquiries from government regulatory authorities and our history of operations in those markets to date, *we believe our method of distribution complies in all material respects with the laws and regulations related to direct selling of the countries in which we currently operate.*

(Emphasis added).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

56.     Additionally, with respect to the Company's operations in China and Hong Kong, the 2014 10-K set forth the following information, in relevant part:

> We generate approximately 98% of our net sales from subsidiaries located outside North America, **with sales in Hong Kong representing 89% of net sales in the latest fiscal year.** Because of the size of our foreign operations, operating results can be impacted negatively or positively by factors such as foreign currency fluctuations, and economic, political and business conditions around the world. In addition, our business is subject to various laws and regulations, in particular regulations related to direct selling activities that create certain risks for our business, including improper claims or activities by our distributors and potential inability to obtain necessary product registrations.
>
> **Most of our Hong Kong revenue is derived from the sale of products that are delivered to members in China**. After consulting with outside professionals**, we believe that our Hong Kong e-commerce business does not violate any applicable laws in China even though it is used for the internet purchase of our products by buyers in China.** But the government in China could, in the future, officially interpret its laws and regulations – or adopt new laws and regulations – to prohibit some or all of our e-commerce activities with China and, if our members engage in illegal activities in China, those actions could be attributed to us. In addition, other Chinese laws regarding how and when members may assemble and the activities that they may conduct, or the conditions under which the activities may be conducted, in China are subject to interpretations and enforcement attitudes that sometimes vary from province to province, among different levels of government, and from time to time. Members sometimes violate one or more of the laws regulating these activities, notwithstanding training that we attempt to provide. Enforcement measures regarding these violations, which can include arrests, raise the uncertainty and perceived risk associated with conducting this business, especially among those who are aware of the enforcement actions but not the specific activities leading to the enforcement action. We believe that this has led some existing members in China – who are signed up as distributors in Hong Kong – to leave the business or curtail their selling activities and has led some potential members to choose not to participate. **Among other things, we are combating this with more training and public relations efforts that are designed, among other things, to distinguish the Company from businesses that make no attempt to comply with the law.** This environment creates uncertainty about the future of doing this type of business in China generally and under our business model, specifically. See "Item 1A. Risk Factors—Because our Hong Kong operations account for a majority of our overall business…."

(Emphasis added).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

57.    Additionally, the 2014 10-K stated the following with respect to the Company's system of internal controls:

**If we fail to achieve and maintain an effective system of internal controls in the future, we may not be able to accurately report our financial results or prevent fraud.  As a result, investors may lose confidence in our financial reporting.**

The Sarbanes-Oxley Act of 2002 requires that we report annually on the effectiveness of our internal control over financial reporting.  Among other things, we must perform systems and processes evaluation and testing.  We must also conduct an assessment of our internal controls to allow management to report on our assessment of our internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act.  We are required to provide management's assessment of internal controls in conjunction with the filing of our Annual Report on Form 10-K.  As disclosed under Item 9A of this report, our management concluded that our internal control over financial reporting was effective at December 31, 2014.  In the future, our continued assessment, or the assessment by our independent registered public accounting firm, could reveal significant deficiencies or material weaknesses in our internal controls, which may need to be disclosed in future Annual Reports on Form 10-K.  *We believe, at the current time, that we are taking appropriate steps to mitigate these risks.* However, disclosures of this type can cause investors to lose confidence in our financial reporting and may negatively affect the price of our common stock.  *Moreover, effective internal controls are necessary to produce reliable financial reports and to prevent fraud.* Deficiencies in our internal controls over financial reporting may negatively impact our business and operations.

(Emphasis added).

58.    The foregoing statements were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (i) that the operations of Natural Health's Chinese subsidiary are not in compliance with applicable Chinese laws; (ii) that the Company's Chinese subsidiary is under investigation by Chinese

authorities; and (iii) as a result, the statements about Natural Health's business, operations, and prospects made by certain of the Individual Defendants were false and misleading and/or lacked a reasonable basis at all relevant times.

59.     On May 4, 2015, the Company filed a quarterly report on Form 10-Q with the SEC for the quarter ended March 31, 2015 (the "Q1 2015 10-Q"), which was signed by Defendant Davidson.   The Q1 2015 10-Q also contained signed SOX certifications by Defendants Sharng and Davidson stating that: (i) the financial information contained in the Q1 2015 10-Q was accurate; (ii) all fraud, whether or not material, was disclosed to the registrant's auditors and the Audit Committee; and (iii) any material changes to the Company's internal control over financial reporting was disclosed.

60.     With respect to the Company's operations in China, the Q1 2015 10-Q stated the following, in relevant part:

> We generate approximately 97% of our net sales from subsidiaries located outside North America, **with sales in Hong Kong representing 92% of net sales in the latest fiscal quarter.** Because of the size of our foreign operations, operating results can be impacted negatively or positively by factors such as foreign currency fluctuations, and economic, political and business conditions around the world. In addition, our business is subject to various laws and regulations, in particular regulations related to direct selling activities that create uncertain risks for our business, including improper claims or activities by our distributors and potential inability to obtain necessary product registrations.

> China has been and continues to be our most important business development project. In June 2004, we obtained a general business license in China. Direct selling is prohibited in China without a direct selling license which we do not have. In December 2005, we submitted a preliminary application for a direct selling license. In June 2006, we submitted a revised application package in accordance with new requirements issued by the Chinese government. ***In June 2007, we launched a new e-commerce retail platform in China that does not require a direct selling license. We believe this model, which offers discounts based on volume purchases, will encourage repeat purchases of our products for personal consumption in the Chinese market. The platform is designed to be in compliance with our understanding of current laws and regulations in China.*** In November 2007, we filed a new, revised direct selling application

29

incorporating a name change, our new e-commerce model and other developments. These direct selling applications were not approved or rejected by the pertinent authorities, but did not appear to materially progress. By 2009, the information contained in the most recent application was stale. The Company applied to temporarily withdraw the license application in February 2009 to furnish new information and intends to amend its application with the goal to re-apply in the next 12 months. We are unable to predict whether we will be successful in obtaining a direct selling license to operate in China, and if we are successful, when we will be permitted to enhance our e-commerce retail platform with direct selling operations.

(Emphasis added).

61.     The foregoing statements were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (i) that the operations of Natural Health's Chinese subsidiary is not in compliance with applicable Chinese laws; (ii) that the Company's Chinese subsidiary is under investigation by Chinese authorities; and (iii) as a result, the statements about Natural Health's business, operations, and prospects made by certain of the Individual Defendants were false and misleading and/or lacked a reasonable basis at all relevant times.

62.     On July 28, 2015, the Company filed a quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"), which was signed by Defendant Davidson.  The Q2 2015 10-Q also contained signed SOX certifications by Defendants Sharng and Davidson stating that: (i) the financial information contained in the Q2 2015 10-Q was accurate; (ii) all fraud, whether or not material, was disclosed to the registrant's auditors and the Audit Committee; and (iii) any material changes to the Company's internal control over financial reporting was disclosed.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1     63.     With respect to the Company's operations in China, the Q2 2015 10-Q

2 stated the following, in relevant part:

> China has been and continues to be our most important business development project. In June 2004, we obtained a general business license in China. Direct selling is prohibited in China without a direct selling license which we do not have. In December 2005, we submitted a preliminary application for a direct selling license. In June 2006, we submitted a revised application package in accordance with new requirements issued by the Chinese government. ***In June 2007, we launched a new e-commerce retail platform in China that does not require a direct selling license. The platform is designed to be in compliance with our understanding of current laws and regulations in China.*** In November 2007, we filed a new, revised direct selling application incorporating a name change, our new e-commerce model and other developments. These direct selling applications were not approved or rejected by the pertinent authorities, but did not appear to materially progress. By 2009, the information contained in the most recent application was stale. The Company applied to temporarily withdraw the license application in February 2009 to furnish new information and intends to amend its application with the goal to re-apply. We are unable to predict whether we will be successful in obtaining a direct selling license to operate in China, and if we are successful, when we will be permitted to enhance our e-commerce retail platform with direct selling operations.

> Most of our Hong Kong revenue is derived from the sale of products that are delivered to members in China. After consulting with outside professionals, ***we believe that our Hong Kong e-commerce business does not violate any applicable laws in China even though it is used for the internet purchase of our products by buyers in China.*** But the government in China could, in the future, officially interpret its laws and regulations - or adopt new laws and regulations - to prohibit some or all of our e-commerce activities with China and, if our members engage in illegal activities in China, those actions could be attributed to us. In addition, other Chinese laws regarding how and when members may assemble and the activities that they may conduct, or the conditions under which the activities may be conducted, in China are subject to interpretations and enforcement that sometimes vary from province to province, among different levels of government, and from time to time. Members could be accused to violate one or more of the laws regulating these activities, notwithstanding training that we attempt to provide. Enforcement measures regarding these violations, which can include arrests, raise the uncertainty and perceived risk associated with conducting this business, especially among those who are aware of the enforcement actions but not the specific activities leading to the enforcement action. We believe that this has led some existing members in China - who are signed up as distributors in Hong Kong - to leave the business or curtail their selling activities and has led some potential members to choose not to participate. ***Among other things, we are managing***

*this risk with more training and public relations efforts that are designed, among other things, to distinguish the Company from businesses that make no attempt to comply with the law.* This environment creates uncertainty about the future of doing this type of business in China generally and under our business model, specifically.

(Emphasis added).

64.     The foregoing statements were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (i) that the operations of Natural Health's Chinese subsidiary is not in compliance with applicable Chinese laws; (ii) that the Company's Chinese subsidiary is under investigation by Chinese authorities; and (iii) as a result, the statements about Natural Health's business, operations, and prospects made by certain of the Individual Defendants were false and misleading and/or lacked a reasonable basis at all relevant times.

65.     On October 27, 2015, the Company filed a quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2015 (the "Q3 2015 10-Q"), which was signed by Defendant Davidson.  The Q3 2015 10-Q also contained signed SOX certifications by Defendants Sharng and Davidson stating that: (i) the financial information contained in the Q3 2015 10-Q was accurate; (ii) all fraud, whether or not material, was disclosed to the registrant's auditors and the Audit Committee; and (iii) any material changes to the Company's internal control over financial reporting was disclosed.

66.     With respect to the Company's operations in China, the Q3 2015 10-Q stated the following, in relevant part:

*We believe that our China e-commerce retail platform operates in compliance with current laws and regulations in China.* Further,

32

after consulting with outside professionals, ***we also believe that our e-commerce direct selling model in Hong Kong does not violate any applicable laws in China, even though it is used for the internet purchase of our products by members in China.*** There can be no assurance, however, that the Chinese authorities will agree with our interpretations of existing laws and regulations or that China will not adopt new laws or regulations. Even if we are successful in obtaining a China direct selling license, our operations will remain subject to the uncertainties inherent in the complex regulatory environment in China.

(Emphasis added).

67.     The foregoing statements were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and compliance policies, and internal controls over financial reporting, which were known to Defendants or recklessly disregarded by them.    Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (i) that the operations of Natural Health's Chinese subsidiary is not in compliance with applicable Chinese laws; (ii) that the Company's Chinese subsidiary is under investigation by Chinese authorities; and (iii) as a result, the statements about Natural Health's business, operations, and prospects made by certain of the Individual Defendants were false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH REGARDING THE INDIVIDUAL DEFENDANTS' WRONGFUL COURSE OF CONDUCT BEGINS TO EMERGE AND THE MISSTATEMENTS CONTINUE

68.     On January 7, 2016 at approximately 11:43 a.m. ET, *Seeking Alpha* published a post indicating that a newspaper investigative report published in China revealed that the Company is being investigated by Chinese authorities.

69.     On this news, Natural Health's stock fell $3.11 per share, or over 10% from its previous closing price, to close at $25.92 per share on January 7, 2016. By the close of the market on January 8, 2016, the stock had fallen another $2.57 per share, to close at $23.35 per share, for a two day drop of $5.68 or almost 20%.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

70.    During the morning of January 11, 2016, the Company filed a current report on Form 8-K and an accompanying press release announcing its estimated revenues for the quarter ended December 31, 2015 and stating the following, in relevant part:

> On January 7, we became aware of an online posting alleging a government investigation of our business in China. By January 11, our Chinese employees were in direct contact with the Beijing City's government officials. ***As of now, we are unaware of an investigation.*** We have initiated the process set forth in China's pertinent law to contact the website where the allegation was posted. We will appropriately disclose any material, verified information.

(Emphasis added).

71.    Thus, the Company did not specifically deny the reports that its Chinese subsidiary was under investigation by Chinese authorities.

72.    Following the Company's issuance of the press release stating it was unaware of any investigation, later that day on January 11, 2016, an analyst firm GeoInvesting, LLC ("GeoInvesting") issued an article to its members (the "January 11 GeoInvesting Article") claiming that Natural Health's offices in China had been raided, citing to eyewitness accounts from neighboring businesses in Natural Health's Beijing building.  Specifically, the January 11 GeoInvesting Article stated that: (i) according to a neighboring office employee, uniformed government authorities raided Natural Health's Beijing office around or shortly after December 24, 2015 and seized property, including several computers, from the Company's office; (ii) on December 28, 2015, the Company suspiciously posted a special notice on its official website warning its distributors to cease from using Natural Health's name or logo without the Company's written confirmation; (iii) snapshots from Natural Health's Hong Kong website appeared to confirm that Natural Health is operating an illegal multi-level marketing scheme in China, where it lacks a direct selling license; and (iv) on January 8, 2016, the Company put up another

announcement on its website announcing that its distributor website will be temporarily suspended for maintenance.

73. On this news, Natural Health's stock fell again, this time $2.65 per share, or over 11%, from its previous closing price, to close at $20.70 per share on January 11, 2016.

74. On January 12, 2016, at approximately 12:08 p.m. ET, the GeoTeam published an article on Seeking Alpha entitled "Is Natural Health Trends Lying About A Chinese Regulatory Investigation?" (the "January 12 GeoInvesting Article"). The January 12 GeoInvesting Article published, in its entirety, the January 11 GeoInvesting Article (which was previously only distributed to GeoInvesting members) and announced that on the morning of January 12, 2016, two major media outlets in China, including *SINA Finance*, had confirmed the information in the January 11 GeoInvesting Article that the Company's Beijing office had been raided. On this news, Natural Health's stock fell $1.52 per share, or over 7%, from its previous close at $19.18 per share on January 12, 2016.

75. On the morning of January 13, 2016, the GeoTeam published yet another article on Seeking Alpha about the Company entitled "Another Day, Another Raid: This Time At Natural Health Trends' Guangzhou Corporate China Headquarters" (the "January 13 GeoInvesting Article"). The January 13 GeoInvesting Article claimed, among other things, that: (i) on January 12, 2016, major Chinese media, including *SINA Finance*, reported that the Company was under formal investigation and that Natural Health's Beijing office had been raided by Chinese authorities, including police and the SAIC; and (ii) after 3:00 p.m. local time on January 13, 2016, several police officers and SAIC officers raided the Company's Chinese headquarters, located in Guangzhou, and took files from the

Company's Guangzhou offices. The article concluded that "it is likely that the NHTC investigation by Chinese regulators is now happening on a national scale."

76. Upon this news, Natural Health's stock plummeted, reaching a low of $15.90 per share during the trading day on January 13, 2016, off over 16% from its opening price.

77. In response to the January 13 GeoInvesting Article, later that day on January 13, 2016, the Company issued a current report on Form 8-K along with an accompanying press release which stated the following, in relevant part:

**Natural Health Trends Refutes False Claims**

LOS ANGELES – January 13, 2016 – Natural Health Trends Corp. (NASDAQ: NHTC), a leading direct-selling and e-commerce company that markets premium quality personal care, wellness and "quality of life" products under the NHT Global brand, announced today it ***strongly refutes false allegations made against it by U.S. and Chinese parties that appear to be working in concert with the goals of improperly influencing the market for the Company's stock and damaging the Company's reputation, brand value and business in China.***

As referenced in a press release issued by Natural Health Trends on January 11, 2016, the Company became aware of an online posting alleging a government investigation of its business in China. On January 12, 2016, the Company was the focus of an additional online posting declaring its offices in Beijing had been "raided" and were under investigation. ***Natural Health Trends is prepared to aggressively defend itself and its business practices from these misleading, speculative allegations.***

The Company believes that some Chinese accusers, working in tandem with parties making online posts, have been aggressively pressing the Beijing City government to conduct an investigation of Natural Health Trends. ***The Company's staff attorney and branch manager participated in a meeting with the Beijing Chaoyang District SAIC and the Public Security Bureau at Natural Health Trends' Beijing office on January 11, 2016.*** Two accusers were present, though they declined to exchange business cards with the Company's employees. The outcome of this meeting, which has been grossly mischaracterized in an online posting as a government "raid," was that the ***government authorities advised the Company and the accusers that there was insufficient evidence to warrant an investigation of Natural Health Trends. No office computers or other Company property has been removed from Natural Health Trends' offices by Chinese governmental authorities.*** In a separate

event, on January 13, 2016, several public security officials of various districts in the Guangzhou city visited the Company's Guangzhou office as part of a routine examination. This is the office that is currently applying for a direct selling license.

*"While we are highly disappointed by these false allegations that have sought to damage our brand, reputation and shareholder value, we are diligently working to defend our Company,"* commented Chris Sharng, President of Natural Health Trends Corp. "In the event of an investigation, we would fully cooperate with the Chinese government. We have also had multiple discussions with U.S. market authorities regarding these matters and are working diligently to ensure the integrity of the market for our stock."

(Emphasis added).

78.   Although the share price temporarily bounced back upon this news from the Company, on January 14, 2016, after the market had fully digested the disclosures by GeoInvesting and the Company, Natural Health's stock fell $2.21 per share, or over 10%, from its previous closing price, to close at $19.17 per share on January 14, 2016.

79.   On February 2, 2016, the Company issued a current report on Form 8-K along with an accompanying press release announcing its results for the quarter and year ended December 31, 2015 and stating the following, in relevant part:

Mr. Sharng continued, "In light of the recent short selling campaign which sought to damage our brand, reputation and shareholder value, *we are diligently working to defend our Company.* Nevertheless, *it provides a great opportunity to allocate our capital towards repurchasing our shares which our Board of Directors strongly believes is an attractive investment.* Their authorization of an additional $55 million for repurchases underscores their confidence. Separately, we are in regular contact with Chinese officials at several government agencies. While we take our disclosure obligations very seriously, we do not intend to make any additional comments regarding this matter unless and until there are additional material developments to disclose."

(Emphasis added).

80.   Following the Company's announcement of its results for the quarter and year ended December 31, 2015, on February 2, 2016, Defendants Sharng and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Davidson appeared on a conference call with analysts whereby Defendant Sharng denied that the Company was under investigation by Chinese regulatory agencies and stated the following, in relevant part:[2]

> Sharng: Before I get into details on the quarter, I want to take a few minutes to address the rumors that had been distributed online of our business. I will also talk about what we are doing to review these allegations.
>
> As we referenced in press releases issued on January 11 and 13, we remain aware of online posting alleging a Chinese government investigation as well as so called raids of our offices in Beijing and Guangzhou. We believe the Chinese accusers working in tandem with the parties responsible for the online posting had been aggressively pressing the Beijing City government to investigate and yet have been unsuccessful.
>
> In light of their concerted attempts to damage our brand, reputation and shareholder value, we are working very hard to defend our company. We are in regular contact with several government agencies in Beijing and Guangzhou to ensure NHT Global's compliance with the law. *We are not under investigation and maintain good government relation.*

(Emphasis added).

81.     With respect to the allegations regarding the Company being under investigation in China, the following exchange occurred between Ann Roger, a private investor, and Defendant Sharng during the call:

> Roger: Hi. I would like to say that I was a longtime investor of your staff until recently. Well, with regard the allegations of whether your offices in China were graded [ph] or not. I was looking carefully at the Chinese Direct Sales Law. *I found that your business model and your paying structure for your members or distributor seem to run against the Chinese laws and more well from the way you do your business and your structure is more like say, [pyramid team] according to Chinese law. So that made me think that your operation in China is practically from borrowed time, because the Chinese authority may go after you or shut you down, it's just a matter of time.*
>
> So my question to you, the first, are you going to drastically change you business model and distributor pay structure to comply to the

Chinese laws? And two, if not do you honestly believe you can obtain direct sales license in China anytime in the future?

And then finally with those [indiscernible] running in the background, how are you going to sustain your growth given the fact that about 80% or more of your growth came from China alone? I would appreciate your answer to all those questions? Thank you.

<u>Sharng</u>: Thank you, Ann. Thank you for calling in. *I disagree with your interpretation of our compliance of the Chinese law,* and our position in our opinion have been very clear in all of our public filings in writing. *We don't believe that we're doing anything that is in violation of the Chinese law. We have a Hong Kong business that is taking orders in Hong Kong, fulfilling in Hong Kong, paying commissions in Hong Kong. We're not doing anything knowingly in violation of any Chinese law or in any jurisdiction for that matter.*

Now, we don't know whether we will get a direct selling license in China and we don't know if we could get it and when we could accomplish that. We have no control with that process. But we are working actively, proactively, and interactively with multiple Chinese government agencies and complying with their legal requirements for obtaining this direct selling license.

*And we are taking specific concrete steps in complying with what's required in the law.* We are hopeful with that we could eventually get a license and we understand that that's going to take some time and we have no prediction over how long that will take. We think we have a very good plan and we are executing that plan effectively in pursuing long term growth.

(Emphasis added).

82.     Following the Company's earnings conference call, on February 3, 2016, GeoInvesting published a third report claiming that on February 3, 2016, Chinese media published a report stating the following: (i) contrary to the Company's statement, the Company's staff attorney was not present during the Company's meeting with the Beijing Chaoyang District SAIC and the Public Security Bureau on January 11, 2016; (ii) that the Chinese Government did not tell Company staff during its first raid that there was "not enough evidence for an investigation;" and (iii) based on the size of manpower used in these office raids, that this is a large, serious, ongoing investigation.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

83. Additionally, GeoInvesting refuted the Company's claims that GeoInvesting was working with Chinese media, stating that "we have never contacted anyone in Chinese media and have not been active in seeking out whistleblowers for NHTC; we are simply reporting on the facts as we see them."

## DAMAGES TO NATURAL HEALTH CAUSED BY THE INDIVIDUAL DEFENDANTS

84. As a direct and proximate result of the Individual Defendants' misconduct, Natural Health failed to maintain proper internal accounting controls, caused the Company to release false and misleading statements and substantially damaged the Company's credibility, corporate image and goodwill.

85. Natural Health has expended and will continue to expend significant sums of money. Additional expenditures and damages that the Company has incurred as a result of the Individual Defendants' breaches of their fiduciary duty include:

      a.    costs incurred from investigating, defending and paying any settlement or judgment in the Securities Class Actions for violations of federal securities laws;

      b.    compensation and benefits the Company paid to the Individual Defendants, who have breached their duties to Natural Health;

      c.    amounts paid in excess of the true value of the Company's stock as a result of the Individual Defendants causing the Company to engage in a series of stock buybacks at artificially inflated prices; and

      d.    costs incurred from the loss of Natural Health's customers' confidence in the Company's services.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

86. Plaintiff brings this action derivatively in the right and for the benefit of Natural Health to redress injuries suffered, and to be suffered, by Natural Health as a direct result of breaches of fiduciary duty and unjust enrichment.

87. Plaintiff is a shareholder of Natural Health, was a shareholder of Natural Health at the time of the wrongdoing alleged herein, and has been a shareholder of Natural Health continuously since that time.

88. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

89. Natural Health is named as a nominal defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have. Plaintiff is and was a shareholder of Natural Health at the time of the transgressions complained of and continues to own the stock of the Company. Plaintiff will adequately and fairly represent the interests of Natural Health and its shareholders in enforcing and prosecuting their rights. Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

90. The wrongful acts complained of herein subject, and will continue to subject, Natural Health to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

91. The wrongful acts complained of herein were unlawfully concealed from Natural Health's shareholders.

92. Throughout the Relevant Period, the Individual Defendants violated multiple corporate governance principles, thus representing evidence of the Individual Defendants' breaches of fiduciary duties. The course of action related to misrepresenting and/or concealing is the following: (i) that the operations of

Natural Health's Chinese subsidiary is not in compliance with applicable Chinese laws; (ii) that the Company's Chinese subsidiary is under investigation by Chinese authorities; and (iii) as a result, the statements about Natural Health's business, operations, and prospects made by certain of the Individual Defendants were false and misleading and/or lacked a reasonable basis at all relevant times.

93.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Current Directors to institute this action since such demand would be a futile and useless act because the Current Directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action. The wrongful acts complained of herein show a wholesale abandonment by the Individual Defendants, including the Current Directors, of their fiduciary duties of loyalty, due care and oversight.

94.     A majority of the Board is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action for the reasons set forth above and below.

95.     As of the date of this Complaint, the current Board consists of the following six individuals: Defendants Sharng, Broady, Chung, Mason, O'Brien and non-defendant Yiu Tung (Enoch) Chan[3].

96.     Demand upon the Current Director Defendants is futile because a majority of the Board is already predisposed to refuse a demand as demonstrated by the Current Director Defendants' position on the merits of the allegations set forth in the GeoInvesting reports, whose allegations also form the basis, in part, of the liability of the Current Director Defendants in the Securities Class Actions and the instant litigation.  In a Form 8-K filed by the Company on January 13, 2016, the Company stated the following, in relevant part:

---

[3] Mr. Chan was appointed to the Board on December 14, 2015.

**Natural Health Trends Refutes False Claims**

LOS ANGELES – January 13, 2016 – Natural Health Trends Corp. (NASDAQ: NHTC), a leading direct-selling and e-commerce company that markets premium quality personal care, wellness and "quality of life" products under the NHT Global brand, announced today *it strongly refutes false allegations* made against it by U.S. and Chinese parties that appear to be working in concert with the goals of improperly influencing the market for the Company's stock and damaging the Company's reputation, brand value and business in China.

As referenced in a press release issued by Natural Health Trends on January 11, 2016, the Company became aware of an online posting alleging a government investigation of its business in China. On January 12, 2016, the Company was the focus of an additional online posting declaring its offices in Beijing had been "raided" and were under investigation. *Natural Health Trends is prepared to aggressively defend itself and its business practices from these misleading, speculative allegations.*

The Company believes that some Chinese accusers, working in tandem with parties making online posts, have been aggressively pressing the Beijing City government to conduct an investigation of Natural Health Trends. The Company's staff attorney and branch manager participated in a meeting with the Beijing Chaoyang District SAIC and the Public Security Bureau at Natural Health Trends' Beijing office on January 11, 2016. Two accusers were present, though they declined to exchange business cards with the Company's employees. The outcome of this meeting, which has been grossly mischaracterized in an online posting as a government "raid," was that the government authorities advised the Company and the accusers that there was insufficient evidence to warrant an investigation of Natural Health Trends. No office computers or other Company property has been removed from Natural Health Trends' offices by Chinese governmental authorities. In a separate event, on January 13, 2016, several public security officials of various districts in the Guangzhou city visited the Company's Guangzhou office as part of a routine examination. This is the office that is currently applying for a direct selling license.

*"While we are highly disappointed by these false allegations that have sought to damage our brand, reputation and shareholder value, we are diligently working to defend our Company,"* commented Chris Sharng, President of Natural Health Trends Corp. "In the event of an investigation, we would fully cooperate with the Chinese government. We have also had multiple discussions with U.S. market authorities regarding these matters and are working diligently to ensure the integrity of the market for our stock."

(Emphasis added).

97.    Thus, because the Current Director Defendants have already determined that they believe that the allegations in the GeoInvesting reports and consequently, the Securities Class Actions, are without merit, and because the instant action is substantially based on the same and/or similar misconduct as the Securities Class Actions, the Current Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this derivative action.

98.    Further, a majority of the Current Director Defendants are not independent, thus rendering demand upon them as futile.

99.    With respect to Defendant Sharng, Sharng has served as the President of the Company since February 2007 and as a director since March 2012. As conceded by the Company in the 2015 Proxy, Defendant Sharng, as a member of senior management of Natural Health, is not an independent director due to his insider status. Additionally, as demonstrated above, Sharng has repeatedly made and/or caused the Company to issue false and misleading statements to the public regarding the Company's purported compliance with Chinese laws and regulations and denying that the Company is under investigation. Further, he is a named defendant in the Securities Class Actions and therefore faces a substantial likelihood of liability, rendering him incapable of independently exercising his business judgment and demand futile.

100.    With respect to Defendant Broady, Broady has served as a director of the Company since October 2008 and, according to the 2015 Proxy, is a beneficial owner of approximately 30.4% of the Company's outstanding common stock. Indeed, as conceded by the Company in the 2015 Proxy, Defendant Broady is not listed as an independent director, thus rendering him incapable of independently exercising his business judgment and demand futile.

101. Further, demand on Broady is futile because Broady, through his company BHS, directly receives payments from the Company under the two Royalty Agreements and Licenses entered into between BHS and the Company with respect to *ReStor*™ and *Soothe*™.  Under the *ReStor*™ Royalty Agreement and License, the Company agreed to pay BHS a royalty (initially 2.5% of sales revenue but later amended to a price per unit) in return for the right to manufacture (or have manufactured), market, import, export and sell this product.

102. With respect to the *Soothe*™ Royalty Agreement and License, the Company agreed to pay BHS a royalty of 2.5% of sales revenue in return for the right to manufacture (or have manufactured), market, import, export and sell *Soothe*™ worldwide.  Thus, due to the fact that Broady directly benefits from the foregoing related party transactions, Broady is an interested director and thus cannot fairly consider a demand to commence litigation.

103. Additionally, Broady was a party to three separate Stock Repurchase Agreements with the Company (which were authorized by the Board) whereby the Company repurchased a total of at least $4.5 million of Company stock from Broady at artificially inflated prices.  Accordingly, because Broady has directly benefited from the foregoing stock repurchases, each of which was authorized by the Board, he is an interested director and cannot independently consider a demand to commence litigation against himself and the very same individuals who approved and/or authorized these stock repurchase agreements.

104. With respect to Defendant Chung, a purported "independent director," as stated by the Company in the 2015 Proxy, Chung provided business consulting services to the Company from 2009 until he joined the Board in 2015.  Therefore, Chung has a long standing prior business relationship with the Company and with the other Individual Defendants, thus rendering him incapable of independently

considering a demand to commence litigation against himself and the other Individual Defendants.

105. Additionally, in the 2015 Proxy, the Company states that "Mr. Chung has been a life-long entrepreneur and businessperson, active in Greater China, *by far our most important market*. *He is extensively experienced in business practices, culture and protocol, particularly those of Hong Kong and China.* Mr. Chung also is an expert in importing and exporting consumer products for our core markets." (Emphasis added).

106. Moreover, the Individual Defendants, including the Current Director Defendants, had a duty to keep abreast of events concerning the Company in Hong Kong and China, including the various laws and regulations that the Company is subject to, especially given the fact that over 90% of the Company's business comes from China and Hong Kong. Indeed, this is demonstrated by the Company's recognition of the importance of the Company's operations in Hong Kong and China and the material adverse impact the Company would likely face in the event of a material adverse change in the Company's business relating to either Hong Kong or China.

107. Specifically, the Company included the following risk factor in its 2014 10-K:

> **Because our Hong Kong operations account for a majority of our overall business, and most of our Hong Kong business is derived from the sale of products to members in China, any material adverse change in our business relating to either Hong Kong or China would likely have a material adverse impact on our overall business.**

> In 2013 and 2014, *approximately 77% and 89% of our revenue, respectively, was generated in Hong Kong. Most of our Hong Kong revenues are derived from the sale of products that are delivered to members in China.* This geographic concentration in our business means that *events or conditions that could negatively impact this geographic region or our operations in this region would have a greater adverse impact upon our overall business and financial*

46

*results* than would be the case with a company having greater geographic diversification.

In contrast to our operations in other parts of the world, we have not implemented a direct sales model in China. The Chinese government permits direct selling only by organizations that have a license that we do not have, and has also adopted anti-multilevel marketing legislation. We operate an e-commerce direct selling model in Hong Kong and recognize the revenue derived from sales to both Hong Kong and Chinese members as being generated in Hong Kong. Products purchased by members in China are delivered to third parties that act as the importers of record under agreements to pay applicable duties. In addition, through a Chinese entity, we sell products in China using an e-commerce retail model. The Chinese entity operates separately from the Hong Kong entity, although a Chinese member may elect to participate separately or in both.

***We believe that the laws and regulations in China regarding direct selling and multi-level marketing are not specifically applicable to our Hong Kong-based e-commerce activity, and that our Chinese entity is operating in compliance with applicable Chinese laws.*** However, there can be no assurance that the Chinese authorities will agree with our interpretations of applicable laws and regulations or that China will not adopt new laws or regulations. ***Should the Chinese government determine that our e-commerce activity violates China's direct selling or anti-multilevel marketing legislation, or should new laws or regulations be adopted, there could be a material adverse effect on our business, financial condition and results of operations.***

Because of the Chinese government's significant concerns about direct selling activities, ***it scrutinizes very closely activities of direct selling companies. At times, investigations and related actions by government regulators have resulted in a few cases where we have paid substantial fines.*** In each of these cases, we have been allowed to recommence operations after the government's investigation, and no material changes to our business model were required in connection with these fines and impediments.

Although we attempt to work closely with both national and local Chinese governmental agencies in conducting our business, ***our efforts to comply with national and local laws may be harmed by a rapidly evolving regulatory climate, concerns about activities resembling violations of direct selling or anti-multi-level marketing legislation,*** subjective interpretations of laws and regulations, and activities by individual distributors that may violate laws notwithstanding our strict policies prohibiting such activities. ***Any determination that our operations or activities, or the activities of our individual distributors or employee sales representatives, or importers of record are not in compliance with applicable laws and regulations could result in the imposition of substantial fines, extended interruptions of business, restrictions on our future ability to obtain business licenses or expand into new locations, changes to***

47

*our business model, the termination of required licenses to conduct business, or other actions, any of which could materially harm our business, financial condition and results of operations.*

(Emphasis added).

108.   Additionally, the 2014 10-K stated the following with respect to the regulatory environment in China:

As a result of restrictions in China on direct selling activities, we are not conducting direct selling in China. Consumers and members purchase the Company's products via our Hong Kong-based website or our e-commerce platform in China. *The regulatory environment in China is complex. Because we operate a direct selling model outside of China, our operations in China have received regulatory and media attention.* At the end of 2005, *China adopted new direct selling and anti-pyramiding regulations that are restrictive and contain various limitations,* including a restriction on the ability to pay multi-level compensation to independent distributors. Regulations are subject to discretionary interpretation by municipal and provincial level regulators. *Interpretations of what constitutes permissible activities by regulators can vary from province to province and can change from time to time because of the lack of clearly defined rules regarding direct selling activities.*

Because of the Chinese government's significant concerns about direct selling activities and its adoption of direct selling and anti-pyramiding regulations, *it scrutinizes very closely activities of direct selling companies. Our business continues to be subject to reviews and investigations by municipal and provincial level regulators.* At times, investigations and related actions by government regulators have caused an obstruction to our members' activities in certain locations, and have resulted in a few cases of enforcement actions. In each of these cases, we helped our members with their defense in the legality of their conduct. So far, no material changes to our business model have been required. We expect to receive continued guidance and direction as we work with regulators to address our business model and any changes that need to be made to comply with the direct selling regulations.

(Emphasis added).

109.   Thus, given the Board's recognition of the importance of the Company's operations in China and the rapidly evolving complex regulatory environment in China, the Board should have been diligent in monitoring events in China and ensuring that the Company's business model was operating in

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

compliance with Chinese laws. This is especially true for: (i) Defendant Chung, whom the Company touted in the 2015 Proxy as having extensive experience in business practices, culture and protocol, particularly those of Hong Kong and China and as being an expert in importing and exporting consumer products for its core markets; (ii) Defendant Broady, whom the Company claimed in the 2015 Proxy as having "a deep understanding of the business of the Company and its industry;" (iii) Defendant Mason, whom the Company touted in the 2015 Proxy as understanding "the business of the Company and potential risks and pitfalls" due to his being a long-time member of the Company Board; and (iv) Defendant Sharng, whom the Company touts in the 2015 Proxy as having "developed a deep understanding of our business globally" due to the fact that he has served as the Company President since 2007, and as the CFO prior to that. Because of their failure to monitor the events in China and ensure that the Company was complying with the applicable rules and regulations in China, Defendants Chung, Broady, Mason and Sharng face a substantial likelihood of liability rendering them incapable of independently exercising their business judgment and demand futile.

110. With respect to the Audit Committee Defendants (Mason, Chung and O'Brien), as members of the Audit Committee, they were responsible for: (i) overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company on behalf of the Board; (ii) reviewing and discussing the annual audited and quarterly financial statements of the Company, including the Company's disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations and the disclosures regarding internal controls and other matters required by SOX and any rules promulgated thereunder by the SEC; (iii) discussing guidelines and policies with respect to risk assessment and risk management to assess and manage the

Company's exposure to risk and discussing with the appropriate officers of the Company the major financial risk exposures of the Company and the steps management has taken to monitor and control these exposures; and (iv) reviewing and providing oversight of insider, affiliated and related party transactions and disclosures for potential conflict of interest situations, and all such transactions subject to the Audit Committee's approval. Therefore, the Audit Committee was directly responsible for failing to comply with accounting principles and approving and/or authorizing the Company's issuance of false and misleading statements, failing to exercise oversight over, recommending and/or approving the numerous related party transactions and stock repurchase agreements involving Defendant Broady as discussed herein, and failing to assess and manage the Company's exposure to risk and the steps management has taken to monitor and control these exposures, including recommending and/or approving the Company's harmful stock repurchase plan in the amount of $70 million. Accordingly, there is significant doubt that Defendants Mason, Chung and O'Brien are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duties, including their duties of good faith, fair dealing and loyalty, as well as other violations of law. As such, Defendants Mason, Chung and O'Brien are not disinterested or independent, and are not capable of responding adequately to a demand. Demand upon them is therefore excused as futile.

111. Defendants Mason and O'Brien – as members of the Nominating Committee – were responsible for: (i) reviewing the Company's corporate governance policies, including the Code, and recommending any modifications of the policies to the Board; and (ii) reviewing and considering possible conflicts of interests of the Board members and management and making recommendations to prevent, minimize or eliminate such conflicts of interest. Defendants Mason and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

O'Brien breached their fiduciary duties by failing to oversee compliance with the Company's corporate governance policies and the Code, failing to report violations of applicable laws, rules, regulations or the Code and failing to consider and/or eliminate conflicts of interests of the Board members, particularly with respect to Defendant Broady. As a result of their breaches of fiduciary duty, Defendants Mason and O'Brien face a substantial likelihood of liability such that any demand upon them is futile.

112. Demand is also futile on the Current Director Defendants because by their wrongful acts and omissions, the Current Director Defendants were unjustly enriched at the expense of and to the detriment of Natural Health. The Current Director Defendants received compensation and director remuneration at the same time in which they were breaching their fiduciary duties owed to the Company. Further, Defendants Broady, Sharng and Mason capitalized on these false and misleading representations by selling their shares on the open market for a substantial profit.

113. Indeed, as a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse, non-public information regarding the Company's troubles in China. While in possession of this material adverse, non-public information regarding the Company, the following current members of the Natural Health Board participated in illegal insider selling:

       a.    During the Relevant Period, Defendant Sharng sold 13,125 shares of Natural Health stock for proceeds of $706,997;

       b.    During the Relevant Period, Defendant Mason sold 10,184 shares of Natural Health stock for proceeds of $418,819; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

c.     During the Relevant Period, Defendant Broady sold 340,389 shares of Natural Health stock for proceeds of $14,431,589. Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested.  Also, these defendants face a substantial threat of liability for breach of their fiduciary duties for insider selling.  Since these directors have breached their fiduciary duties and are interested, any demand upon them is futile.

114.  Further, the Current Director Defendants abused their control and wasted Natural Health's corporate assets by authorizing and effectuating the repurchase of $70 million worth of the Company's stock at prices they knew, or recklessly were unaware, were artificially inflated.  Based on the foregoing, Natural Health paid millions of dollars more than the fair value for Natural Health stock that it repurchased.

115.  To make matters worse, after learning of the allegations concerning the Company's illegal activities in China, on January 13, 2016, the Company issued a Form 8-K announcing that the Board had increased the amount of stock repurchases from $15 million to $70 million, thus further wasting Company assets in order to keep the stock price artificially inflated and continue with the fraudulent scheme of lying to investors.  The foregoing demonstrates that the Current Director Defendants were never acting in the Company's best interest and thus, they are incapable of deciding whether pursuing legal action would be in the Company's best interest.

116.  The Individual Defendants' conduct described herein and summarized above demonstrates a pattern of misconduct that could not have been the product

of legitimate business judgment as it was based on intentional, reckless, and disloyal misconduct. Thus, none of the Individual Defendants, who constitute a majority of the current Board of the Company, can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Individual Defendants faces a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.

117. Based on the foregoing, the Current Director Defendants face a sufficiently substantial likelihood of liability and accordingly, there is a reasonable doubt as to each Defendant's disinterestedness in deciding whether pursuing legal action would be in the Company's best interest. Accordingly, demand upon the Current Director Defendants is excused as being futile.

## CAUSES OF ACTION

## COUNT I

**(Against The Individual Defendants for Breach of Fiduciary Duty)**

118. Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

119. The Individual Defendants owed and owe Natural Health fiduciary obligations, including the obligations of good faith, fair dealing, loyalty and care. Among other things, the Individual Defendants owed a fiduciary duty to Natural Health to supervise the issuance of its press releases and public filings and ensure that they were truthful, accurate and conformed to federal and state securities law. The Individual Defendants breached their fiduciary duties by misrepresenting and/or concealing the following: (i) that the operations of Natural

Health's Chinese subsidiary are not in compliance with applicable Chinese laws; (ii) that the Company's Chinese subsidiary is under investigation by Chinese authorities; and (iii) as a result, the statements about Natural Health's business, operations, and prospects made by certain of the Individual Defendants were false and misleading and/or lacked a reasonable basis at all relevant times.

120. By reason of the foregoing, Natural Health was damaged.

## COUNT II

**(Against the Individual Defendants for Waste of Corporate Assets)**

121. Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

122. Defendants breached their fiduciary duties by failing to properly supervise and monitor Natural Health by allowing the Company to engage in an illegal, unethical and improper course of conduct.

123. As a result of the Individual Defendants' illicit course of conduct and breaches of fiduciary duty, Natural Health has wasted valuable corporate assets through harmful stock repurchases, related party transactions with Defendant Broady and payments of compensation to the Individual Defendants because the Company has incurred significant potential liability for legal costs, penalties, fines, and/or legal fees in connection with the defense of the Individual Defendants' unlawful course of conduct complained of herein.

124. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

125. By reason of the foregoing, Natural Health was damaged.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**COUNT III**

**(Against the Individual Defendants for Unjust Enrichment)**

126. Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

127. Through the wrongful course of conduct and actions complained of herein, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of Natural Health. The wrongful conduct was continuous and resulted in ongoing harm to the Company. The Individual Defendants were unjustly enriched pursuant to receiving compensation and/or director remuneration and proceeds from the illegal insider trading transactions while breaching their fiduciary duties to the Company, as alleged herein.

128. Further, Defendant Broady was unjustly enriched at the Company's expense by entering into three stock purchase agreements whereby he sold some of his own personal stock holdings back to the Company at artificially inflated prices pursuant to the Company's stock buyback program.

129. Plaintiff, as a shareholder of Natural Health, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, from their wrongful course of conduct and fiduciary breaches.

130. By reason of the foregoing, Natural Health was damaged.

**COUNT IV**

**(Derivatively Against the Individual Defendants for Gross Mismanagement)**

131. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

132. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their

55

responsibilities and fiduciary duties with regard to prudently managing the assets and business of Natural Health in a manner consistent with the operations of a publicly held corporation.

133. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Natural Health has sustained significant damages.

134. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A. Directing Defendants to account to Natural Health for all damages sustained or to be sustained by the Company by reason of the wrongs alleged herein;

B. Directing Natural Health to take all necessary actions to reform its corporate governance and internal procedures to comply with applicable laws and protect the Company and its shareholders from a recurrence of the events described herein, including, but not limited to, a shareholder vote resolution for amendments to Natural Health's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote on corporate governance policies;

C. Awarding to Natural Health restitution from the Defendants and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants.

D. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

E.    Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.


Dated: March 4, 2016                    Respectfully submitted,

                                        **FARUQI & FARUQI, LLP**

                                        /s/ *Barbara A. Rohr*_____
                                        Barbara A. Rohr
                                        10866 Wilshire Boulevard, Suite 1470
                                        Los Angeles, CA 90024
                                        Telephone: (424) 256-2884
                                        Facsimile:  (424) 256-2885
                                        Email:  brohr@faruqilaw.com

                                        *Attorneys for Plaintiff*

**OF COUNSEL:**

**FARUQI & FARUQI, LLP**
Stuart J. Guber
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
Telephone: 215-277-5770
Facsimile:  215-277-5771
Email: sguber@faruqilaw.com

Nadeem Faruqi
Nina M. Varindani
685 Third Avenue, 26th Floor
New York, New York 10017
Telephone: 212-983-9330
Facsimile:  212-983-9331
Email: nfaruqi@faruqilaw.com
        nvarindani@faruqilaw.com

*Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

# VERIFICATION

I, Angela Kleinfeldt, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the forgoing is true and correct.

Dated: March 4, 2016

_Angela Kleinfeldt_
Angela Kleinfeldt